O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

REFUGIA D. V.,

        Plaintiff,

  v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

        Defendant.

Case No.  5:17-cv-02261-KES

MEMORANDUM OPINION AND
ORDER

**I.**

**BACKGROUND**

    In January 2014, Refugia D. V. ("Plaintiff") filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") alleging disability commencing January 24, 2013, the day she stopped working.[2]

---

    [1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security."

    [2] On January 24, 2013, Plaintiff went to the emergency room of the hospital where she worked complaining of chest pain and anxiety due to "stress of work." AR 265-67.  She was discharged the next day with "symptoms much improved."

Administrative Record ("AR") 59, 163-166, 199.

On September 21, 2016, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE"). AR 38-58.

On November 22, 2016, the ALJ issued a decision denying Plaintiff's applications. AR 16-35. The ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "degenerative disk disease of the lumbar spine; and syringomyelia at C3 level." AR 21. Despite these impairments, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform work with the following exertional demands:

> [S]he can lift and carry 20 pounds occasionally and frequently 10
> pounds; can stand and walk in combination of two hours in an eight-
> hour workday and sit for six hours in an eight-hour workday; can
> occasionally push and pull with the bilateral extremities within the
> weight limits; can occasionally climb ramps or stairs, balance, stoop,
> kneel, crouch, and crawl; cannot climb ladders, ropes or scaffolds;
> avoid walking on uneven terrain; cannot reach overhead bilaterally;
> can frequently handle and finger on the right, but no limitation on the
> left; and avoid all exposure to unprotected machinery or heights.

AR 25. The lifting/carrying limits in this RFC are consistent with light work, while the walking/standing limits are consistent with sedentary work.[3]

_____

AR 265. She was prescribed anti-anxiety medication to reduce stress. AR 267-68.

[3] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A "full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. In contrast, sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a). "Since being on one's feet is required

Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff could perform her past relevant work as generally performed (i.e., sedentary): the jobs of medical case director and medical case manager, Dictionary of Occupational Titles ("DOT") codes 075.117-022 and 075.117-090. AR 29. The ALJ concluded that Plaintiff was not disabled. Id.

## II.

## STANDARD OF REVIEW

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is

'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10.

3

harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

### III.

### ISSUES PRESENTED

Plaintiff's appeal presents the following issues:

Issue One: Whether the ALJ erred in finding that Plaintiff's "migraines and drop foot" are not severe impairments.

Issue Two: Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony.

Issues Three and Four: Whether the ALJ erred in evaluating the opinions of treating physician Dr. Luthra concerning Plaintiff's physical and mental limitations.

Issue Five: Whether the ALJ properly developed the record.

Issue Six: Whether remand is required to permit the ALJ to evaluate new evidence submitted to the Appeals Council but not made part of the administrative record.

(Dkt. 19, Joint Stipulation ["JS"] at 3-4.)

### IV.

### DISCUSSION

A. **ISSUE ONE: The Determination of Plaintiff's Severe Impairments.**

**1. Step Two of the Sequential Evaluation Process.**

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)[4]; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1996). Step two requires the Commissioner to determine whether the claimant has any severe medically determinable impairment(s). A "medically determinable impairment" exists where

---

[4] Citations are to regulations in effect at the time of the ALJ's opinion.

4

"medical signs and laboratory findings … show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged…." 20 C.F.R. §§ 404.1529(a), 416.929(a).

Once a claimant has shown that he suffers from a medically determinable impairment, he next has the burden of proving that these impairments are "severe." Edlund v. Massanari, 2001 U.S. App. LEXIS 17960, at * 23 (9th Cir. Aug. 9, 2001). An impairment is "severe" if it significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Basic work activities are the abilities and aptitudes necessary to do most jobs. 20 C.F.R. §§ 404.1521(b), 416.921(b). Examples of physical work activities include walking, standing, sitting, reaching and carrying. Id. A severe impairment is one that has "more than a minimal effect on the individual's ability to do work." Social Security Ruling ("SSR") 96-2p. Conversely, an impairment is "non-severe" if it does not significantly limit a claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). If a claimant does not have a medically determinable impairment that is "severe" over a period of at least twelve consecutive months, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a), 404.1509, 416.920(a)(4)(ii), 416.909.

If an ALJ accounts for all the limitations caused by an impairment in the assessed RFC, then the ALJ's failure to label that impairment "severe," even if erroneous, is harmless error. Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (holding that any error to list a condition as severe was harmless because the ALJ considered the condition when assessing the claimant's limitations).

**2. The ALJ's Analysis.**

Regarding foot drop, the ALJ found as follows:

The undersigned finds that the claimant's medically determinable impairment of right foot drop is nonsevere. There is objective evidence in the medical record that the claimant has been

evaluated and treated for headaches.[5]  For example, the record indicates mild or no findings related to right foot drop, such as issues with weakness, numbness, loss of function, pain, and inability to point toes.  Furthermore, no aggressive treatment was recommended or anticipated for this condition.  Accordingly, the claimant's medically determinable impairment of right foot drop is nonsevere.

AR 23.

Regarding headaches, the ALJ found as follows:

The undersigned finds that the claimant's medically determinable impairment of headaches is nonsevere.  There is objective evidence in the medical record that the claimant has been evaluated and treated for headaches.  Moreover, in her headache questionnaire, she alleged that she has headaches on a daily basis.  The medical evidence of record, however, reveals unremarkable findings.  For example, the record indicates mild or no findings related to headaches, such as issues with trigeminal neuralgia, temporal arteritis, masses in the brain, subarachnoid hemorrhaging, mass lesions, vascular malformation, subdural hematoma, or central nervous system infection.  Furthermore, no aggressive treatment was recommended or anticipated for this condition.  Accordingly, the claimant's medically determinable impairment of headaches is nonsevere.

AR 22.

### 3.  Analysis of Claimed Errors.

#### a.  Foot Drop.

As evidence supporting the alleged severity of Plaintiff's right foot drop,

---

[5] The ALJ evidently meant right foot drop in this paragraph.

Plaintiff cites to the report of consultative examiner Dr. Sohail Afra. (JS at 5.) Dr. Afra observed as follows:

> The claimant was walking with antalgic gait with AFO [ankle foot orthosis] brace intact. The claimant's brace was taken off during the examination with the gate being more antalgic and on few occasions, she had to touch the wall when she was walking.
>
> ***
>
> The claimant was asked to walk with and without the AFO [ankle foot orthosis] brace on the right. Her gait was more antalgic. The foot drop was more obvious when she was walking without her brace.

AR 355, 357. Dr. Afra also noted "decreased muscle bulk and atrophy on the right lower extremity when compared to the left." AR 357. Dr. Afra concluded that Plaintiff's AFO brace "on the right is medically indicated for all ambulation," but using the brace, Plaintiff could walk or stand for two hours out of an eight-hour workday, consistent with the demands of sedentary work. AR 358.

The ALJ accounted for Dr. Afra's opinions in the assessed RFC by limiting Plaintiff to a combination of standing/walking for only two hours in an eight-hour workday. AR 25. Plaintiff argues, "Because the foot drop, according to [Dr. Afra], limits [Plaintiff's] standing and walking to only two hours, it is by definition severe contrary to the ALJ's unsupported finding that it was not severe." (JS at 10-11.) Plaintiff fails to explain, however, how this alleged error was prejudicial. Plaintiff fails to discuss any medical evidence that Plaintiff's foot drop limits her walking more seriously than Dr. Afra opined, and the ALJ fully credited Dr. Afra's opinion concerning Plaintiff's walking limitations.[6]

---

[6] Dr. Luthra opined that Plaintiff could walk or stand for only one hour during an eight-hour workday, but he did not mention foot drop as a diagnosis and he qualified his opinion as Plaintiff's observation. AR 505. As discussed below, the ALJ stated legally sufficient reasons for giving his opinions "little weight." AR

Furthermore, Plaintiff stated that she had right foot drop since 1992. AR 255 ("When asked about lower extremity symptoms, she stated that since the surgery in 1992 on her back, she has been experiencing right foot drop."), AR 43 ("I had a herniated disc repair … and that surgery failed, so I have a foot drop."). Indeed, in 2008, a treating doctor noted that she had right-side foot drop but still described her gait as "normal." AR 258. In 2010, Dr. Limonadi observed, "She ambulates with excellent gait and balance." AR 513. In 2015, she told Dr. Herr that she had "years of foot drop" and that condition was "unchanged." AR 425. Plaintiff continued to work until January 2013. AR 41, 199. Plaintiff's ability to work for more than two decades even with right foot drop further evidences that this condition was not disabling.

                b. Headaches.

Plaintiff cites to numerous medical records reflecting that she has complained of headaches for years. (JS at 4); see AR 374 (7/7/14: "Headaches … twice per week she has to take Imitrex 100 mg/d"), AR 389 (2/7/13: "She has headache 2-3x/week. She has more headache with excessive work."), AR 395 (same on 7/23/12), AR 398 (same on 6/1/12), AR 401 (3/16/12: "She has intractable headache, which has a characteristic of migraine …. She has Tension Headaches – stress induced. Occupational stress."), AR 376 (same on 7/7/14). Some of these records dated from 2012 when Plaintiff was still working. Indeed, Dr. Luthra attributes her headaches, in part, to job-related stress. These record do not show that Plaintiff's headaches more than minimally limited her ability to work.

Plaintiff also completed a headache questionnaire. AR 198 (dated February 20, 2014, according to AR Index). She claimed to experience "daily" headaches lasting "from 2 hrs to 6 hrs." Id. She claimed that these headaches affected her ability to do routine activities "almost daily." Id. To relieve her pain, she used the

28.

Duragesic/fentanyl patch daily plus Imitrex/sumatriptan and Altracet/tramadol, and she would "lay down in [a] closed dark area using warm neck roll." Id.

While Plaintiff asserts that the ALJ "ignored" this questionnaire (JS at 4), the ALJ specifically referenced it and discounted it as reflecting Plaintiff's subjective complaints and appearing exaggerated when compared to other evidence of record. AR 22; see also AR 26 ["The undersigned considered all of [Plaintiff's] subjective complaints, including … questionnaires."]).  As discussed below, the ALJ gave clear and convincing reasons for discounting Plaintiff's subjective symptom testimony.  Indeed, Plaintiff reported to Dr. Luthra that she experienced headaches only 2 or 3 times/week, not daily.  Compare AR 198 and AR 374, 389, 395, 398.  In her February 2014 Function Report, Plaintiff did not claim that any of her impairments affected her ability to concentrate or complete tasks.  AR 195.

As evidence that Plaintiff's headaches are a severe impairment, Plaintiff cites Dr. Luthra who "indicated migraines as a diagnosis [and] indicated, at least in part, that [Plaintiff] would be absent for three or more days a month based upon this impairment."  (JS at 5, citing AR 505-06.)  Dr. Luthra listed Plaintiff's diagnoses as "syringomyelia, depression, migraine, ulcer."  AR 505.  He opined that Plaintiff would "likely be absent from work due to the impairment(s) and/or treatment(s)" three or more days per month, but he did not discuss which conditions/treatment would cause her absenteeism and qualified this opinion as Plaintiff's observation. AR 506.  His opinion does not provide substantial evidence to support a finding that Plaintiff migraines were a severe impairment.  Moreover, as discussed below, the ALJ gave legally sufficient reasons for discounting his extreme and contradictory opinions.[7]

_____

[7] For example, Dr. Luthra opined that Plaintiff would need to lie down in bed for 1½ hours every 2 hours (AR 506), but at the same time he opined that she would need 10-minute walking breaks every 20 minutes, although she could only walk or stand for 1 hour/day.  AR 505-06.  He opined that Plaintiff could never reach in any direction, but Plaintiff reported that she could do tasks that require

1    B. **ISSUE TWO: The Evaluation of Plaintiff's Subjective Symptom Testimony.**

2         **1.  Rules for Evaluating Subjective Symptom Testimony.**

3         An ALJ's assessment of pain level is entitled to "great weight."  Weetman v.

4    Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (citation omitted); see also Nyman v.

5    Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not 'required to believe

6    every allegation of disabling pain, or else disability benefits would be available for

7    the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina v.

8    Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citation omitted).

9         If the ALJ finds that a claimant's testimony as to the severity of his pain and

10   impairments is unreliable, "the ALJ must make a credibility determination with

11   findings sufficiently specific to permit the court to conclude that the ALJ did not

12   arbitrarily discredit claimant's testimony."  Thomas v. Barnhart, 278 F.3d 947, 958

13   (9th Cir. 2002).  If the ALJ's credibility finding is supported by substantial

14   evidence in the record, courts may not engage in second-guessing.  Id.

15        In evaluating a claimant's subjective symptom testimony, the ALJ engages in

16   a two-step analysis.  Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must

17   determine whether the claimant has presented objective medical evidence of an

18   underlying impairment [that] could reasonably be expected to produce the pain or

19   other symptoms alleged."  Id. at 1036.  If so, the ALJ may not reject a claimant's

20   testimony "simply because there is no showing that the impairment can reasonably

21   produce the degree of symptom alleged."  Smolen v. Chater, 80 F.3d 1273, 1282

22   (9th Cir. 1996).

23        Second, if the claimant meets the first test, the ALJ may discredit the

24   claimant's subjective symptom testimony only if he makes specific findings that

25   _____

26   some reaching such as cleaning the bathroom, dusting, washing the laundry, and
     preparing sandwiches.  Compare AR 506 and AR 192.  He opined Plaintiff could

27   never lift 10 pounds (AR 505), but Plaintiff said that she "can only lift 10 pounds"
     (AR 195).

28

support the conclusion.  <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).

Absent a finding or affirmative evidence of malingering, the ALJ must provide

"clear and convincing" reasons for rejecting the claimant's testimony.  <u>Lester</u>, 81

F.3d at 834; <u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

### 2. The ALJ's Reasons for Discounting Plaintiff's Testimony.

Plaintiff testified that she spends "80 plus percent of the time" lying down in

bed.  AR 44.  She testified that standing for "no more than five, ten minutes" was

the most she could do.  AR 48; <u>compare</u> AR 195 ("can only stand 2 hrs").  She

estimated that she could sit in a chair for 20-30 minutes.  AR 49; <u>compare</u> AR 195

("sitting one hr").  She testified that the most weight she could lift was five pounds.

AR 49; <u>compare</u> AR 195 ("can only lift 10 pounds").  Even with strong pain

medication, she rated her daily pain as 8 on a scale of 1 to 10.  AR 43.  She reported

being "unable to use [her] hands to type or hold due to loss of feeling & strength."

AR 195; <u>compare</u> AR 45 ("I can type maybe – well, I haven't tried to type, but …

to use my phone if I do … a few keys I'm okay ….").  She testified that she had

difficulty lifting her arms "to type or to … keep them up for more than a couple of

minutes because then it gets really numb."  AR 45.  Plaintiff reported that before

her condition, she was able to prepare "complete meals with served courses" but

became unable "to cook in the stove because of the heat; afraid to burn myself due

to loss of sensation."  AR 192; <u>compare</u> AR 255 (Plaintiff told neurologist in 2008

she has "a difficult time discriminating between hot and cold and she is afraid of

burning her hands during cooking").  She goes on walks with her disabled husband

for 20-30 minutes.  AR 40, 190, 195.  Her husband and adult children take care of

their dog, and she sometimes accompanies her husband to the grocery store.  AR

191, 193.

The ALJ gave at least six reasons for discounting Plaintiff's testimony

"concerning the intensity, persistence and limiting effects" of her symptoms:

(1) inconsistency with her daily activities, (2) inconsistency with medical evidence,

(3) lack of atrophy, (4) Plaintiff's use of a C-collar neck brace and cane at the hearing when such assistive devices are not medically necessary, (5) Plaintiff's reason for leaving her prior employment, and (6) lack of supporting objective evidence. AR 26-27. Because the lack of supporting objective evidence is not a sufficient reason, standing alone, to discount a claimant's subjective symptom testimony, the Court will consider the ALJ's other stated reasons.

a. <u>Reason One</u>: Inconsistency with Daily Activities.

ALJs may consider contradictions between a claimant's reported limitations and a claimant's daily activities when assessing subjective symptom testimony. <u>Morgan v. Apfel</u>, 169 F.3d 595, 599-600 (9th Cir. 1999) (claimant's "ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child" were inconsistent with disabling mental impairment); <u>Tidwell v. Apfel</u>, 161 F.3d 599, 602 (9th Cir. 1998) (daily activities inconsistent with total disability undermined subjective testimony of disabling pain); <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995) (claimant's ability to perform "various household chores such as cooking, doing the dishes, going to the store, visiting relatives, and driving" inconsistent with claimed inability to do light work).

The mere fact that a claimant can carry on some daily activities, however, does not defeat a claim of disability. <u>Verigan v. Halter</u>, 260 F.3d 1044, 1050 (9th Cir. 2001) (claimant's ability to "go grocery shopping with assistance, walk approximately an hour in the malls, get together with her friends, play cards, swim, watch television, and read" was not inconsistent with pain testimony where "these physical activities did not consume a substantial part of [her] day"). Thus, the relevant issue becomes whether the claimant's activities (1) contradict his/her testimony, or (2) "meet the threshold for transferable works skills." <u>Orn v. Astrue</u>, 495 F.3d 625, 639 (2007); <u>Derr v. Colvin</u>, 2014 WL 5080437, at *12 (D. Ariz. Oct. 9, 2014) ("Only when a level of activity is inconsistent with a claimant's claims of limitations should those activities have any bearing on the claimant's credibility.").

Here, the ALJ found the following inconsistencies between Plaintiff's claimed limitations and her daily activities:

> The medical records reveal that the claimant was able to prepare simple meals, clean, do the laundry, dust, ride in a car, shop in stores, pay bills, read, watch television, go to church, and spend time with others [AR 192-94]. Moreover, at the hearing, the claimant admitted that she has a valid driver's license [AR 39-40]. Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. The claimant's ability to participate in such activities is inconsistent with the claimant's statements concerning the alleged intensity, persistence, and limiting effects of symptoms.
>
> ***
>
> [T]he claimant indicated that she had difficulty lifting, carrying, standing, walking, sitting, balancing, and raising her hands or arms. [AR 195.] However, this is inconsistent with her acknowledgment that she prepared simple meals, cleaned, did the laundry, dusted, rode in a car, shopped in stores, paid bills, read, watched television, went to church, and spent time with others [AR 192-94].

AR 26.

Plaintiff argues that having a valid driver's license does not mean she is physically capable of driving; she testified that she does not drive because when she "turn[s] to the right, [she] get[s] dizzy." (JS at 11, citing AR 40.) In her Function Report, she stated, "Not able to drive due to my neck be[ing] stiff." AR 193. When asked to explain further why she does not drive, she said, "Because of neck stiffness & not able to turn to the sides; dizziness, gait unsteady, balance (loosing) [sic]." Id. In April 2014, however, psychological consultative examiner Dr. Cross

observed that Plaintiff arrived for her appointment "by an automobile driven by herself." AR 342. Thus, substantial evidence supports the ALJ's finding that Plaintiff could drive during the period of claimed disability.

Plaintiff argues that as to her other activities, the ALJ merely "referenced" them and failed to show any inconsistency between them and her testimony. (JS at 13, 23.) However, Plaintiff's claimed physical limitations are extreme. She testified that standing for "no more than five, ten minutes" was the most she could do. AR 48. She was "unable to use [her] hands to type or hold …." AR 195. She could not lift her arms even as high as a typing position for "more than a couple of minutes." AR 45. Limitations this severe are inconsistent with the physical demands of cleaning a bathroom for 20-30 minutes (AR 192), which would require standing for more than five or ten minutes and reaching for more than a couple of minutes. Shopping for 30-45 minutes (AR 193) would require more walking/standing than Plaintiff claimed that she could do, even if she holds onto the cart. Dusting, doing laundry for 20 minutes, and preparing sandwiches (AR 192) would require using her hands to hold objects and some reaching. Going to church (AR 194) would require being able to walk more than 100 feet and/or sit for more than 20-30 minutes (AR 49). Thus, substantial evidence supports the ALJ's finding of inconsistency.

As to mental impairments, many of the activities listed by the ALJ require cognitive and social skills similar to work activities, and are therefore inconsistent with the mental disabilities asserted by Dr. Luthra and Plaintiff's counsel. See AR 507-09; JS at 36-37. Furthermore, Plaintiff has never testified that she has mental impairments. Plaintiff did not allege any mental impairments in her DIB application. AR 59. In her Function Report, she did not claim that her condition affects any of her mental abilities. AR 195. She acknowledged that she can handle her own finances (AR 193), read books (AR 194), shop online (AR 193), socialize with friends on the phone (AR 194), follow instructions well (AR 195), and handle

stress and changes "very good" (AR 196). She denied receiving treatment for "mental health, depression, anxiety, or anything." AR 50; compare AR 329 (8/28/13: "She continues to have therapy thru Dr. Garrett, psychologist, who presently agrees with her not using anti-depressants particularly in the setting of the use of fentanyl patch.") Thus, while her activities are inconsistent with her new claim of mental disability, they are not inconsistent with her testimony, because she did not testify to any mental disability.

b. Reason Two: Inconsistency with Medical Evidence.

As two examples of inconsistencies between Plaintiff's claimed functional limitations and the medical evidence, the ALJ cited "medical evidence of record indicated that the claimant's range of motion of the neck was only mildly limited, and her musculoskeletal examination was normal." AR 26, citing AR 271 and AR 485.

AR 271 is page 3 of a 10-page record from an emergency room ("ER") visit for chest pain on January 24, 2013, Plaintiff's alleged onset date. Shortly after arriving at the ER, she advised staff of her history of "chronic back pain, chronic neck pain." AR 269. Staff examined her and noted "denies … upper or lower extremity weakness" and "denies headaches" and "fully ambulatory no limitations." AR 269. Staff described her neck as "supple." AR 270. Under the headings "Physical Exam / Musculoskeletal," staff noted "Full range of motion in all extremities." AR 271. Plaintiff was discharged later that afternoon after receiving a negative chest x-ray and reporting that she felt better. AR 271, 276.

Plaintiff argues that AR 271 was part of a "limited ER examination" focused on chest pain and is unreliable because it reports a "full range of motion" despite Plaintiff's documented neck and back impairments. (JS at 15.) The ER staff, however, observed and described Plaintiff as "fully ambulatory" with a "supple" neck. This is inconsistent with Plaintiff's claim that she needs a cane to ambulate (AR 47, 196 [needs cane "daily to ambulate"]) and suffers from a stiff neck that she

cannot turn (AR 193). Moreover, when Plaintiff visited the ER in May 2014 complaining of diverticulitis, the staff again observed that she had "full range of motions in all extremities." AR 444.

AR 485 is from a 3-page set of notes by Dr. Craig Rosenblum from an office visit on June 23, 2016. AR 484-86. In the first paragraph, he recorded Plaintiff's subjective complaints. AR 484. He asked her to rate her "average" and "worst" pain for various parts of her spine. AR 484-85. He noted that she was wearing a "soft cervical collar." AR 485. He then did a cervical exam evaluating the strength and tenderness of various muscles and the range of motion of her neck and shoulders. AR 484. Regarding Plaintiff's neck, he observed as follows:

> Neck: flexion is mildly limited with pain, extension is mildly limited
> with no pain, rotation to the right is mildly limited with pain, rotation
> to the left is mildly limited with no pain, lateral bending to the right is
> moderately limited with pain, lateral bending to the left is moderately
> limited with pain.

AR 485; see also AR 503 (same findings 7/27/15). In other words, Dr. Rosenblum observed that Plaintiff was only mildly limited turning her head to the right or left.

In contrast, in her Function Report (undated), Plaintiff stated that she suffered from a "stiff" neck and was not able to drive because she was "not able to turn to the sides." AR 193. Thus, the ALJ did not err in finding that Plaintiff's testimony was inconsistent with AR 271 and AR 485.

c. <u>Reason Three</u>: Lack of Atrophy.

Regarding atrophy, the ALJ found as follows:

> Muscle atrophy is a common side effect of prolonged and or
> chronic pain due to lack of use of a muscle in order to avoid pain.
> There is no evidence of atrophy in the claimant's evidence as a whole.
> It can be inferred that, although the claimant experienced some degree
> of pain in her back and neck, the pain has not altered her use of those

muscles to an extent that has resulted in atrophy.

AR 26.

Plaintiff first argues that this is not a valid consideration, citing Miller v. Sullivan, 953 F.2d 417 (8th Cir. 1992). (JS at 24.) In Miller, the Eighth Circuit observed that "although muscle deterioration may result from disuse, disabling pain does not always result in muscle disuse. Therefore, the ALJ cannot discount Miller's claim simply because she does not show an effect that other people suffering from disabling pain may show." Id. at 422-23. Miller is factually distinguishable, because here, Plaintiff testified to muscle disuse. She testified that she spends "80 plus percent of the time" lying down in bed (AR 44) and she does not use her hands to hold things (AR 195) or raise her arms as high as typing position for more than a few minutes (AR 45). She uses pillows to hold up her books (AR 194) and a foam collar to hold up her neck upright when she is not in bed (AR 47, 196).

Moreover, the Ninth Circuit permits ALJs to consider whether the lack of atrophy is consistent with a claimant's subjective symptom testimony. See Osenbrock v. Apfel, 240 F.3d 1157, 1165-66 (9th Cir. 2001) (upholding an ALJ's rejection of a claimant's credibility where the ALJ made specific findings including, but not limited to, a lack of atrophy); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (upholding adverse credibility determination where claimant's testimony that pain "required her to lie in a fetal position all day" was inconsistent with not "exhibit[ing] muscular atrophy").[8]

_____

[8] The Court also notes unpublished contrary opinions. See Lapeirre-Gutt v. Astrue, 382 F. App'x 662, 665 (9th Cir. 2010) (rejecting lack of evidence of atrophy as a reason for adverse credibility determination as not based on substantial evidence, where no medical evidence "suggests that high inactivity levels necessarily leads to muscle atrophy"); Valenzuela v. Astrue, 247 F. App'x 927, 929 (9th Cir. 2007) (ALJ's adverse credibility determination was not supported by substantial evidence where the record was devoid of any medical testimony to support ALJ's finding that absence of evidence of muscular atrophy indicated

Plaintiff next argues that the ALJ's finding of "no evidence of atrophy" is inaccurate, because Dr. Afra reported, "The claimant was noted to have decreased muscle bulk and atrophy on the right lower extremity compared to the left." AR 357. Regarding motor strength in other body parts, Dr. Afra found strength of 5/5 for her left leg, 4 or 4+/5 for both arms, reduced strength in her right foot, and "mildly" decreased grip strength on the right compared to the left. AR 354, 357.

Other medical sources also offered observations concerning Plaintiff's muscle strength. In a series of examinations between February and May 2014, Dr. Rosenblum tested all left-side arm and shoulder muscles tested at 5/5, and on the right side, her deltoid and bicep were 5/5, but her rhomboid and trapezius were 4+/5. AR 363, 366, 369. Her leg muscles were rated 5/5. AR 364, 366, 369-70. Dr. Rosenblum made similar findings in 2015 and 2016. AR 485, 488-89, 491-92, 496-97, 500-01, 503-04. Due to the lack of change over the course of three years, it is unclear if he truly made new findings during each examination.

In March 2014, Dr. Luthra found Plaintiff's hamstring strength 5/5, but rated her upper extremity muscles 4/4. AR 379. In December 2012, Dr. Luthra found most of her muscles rated 5 (defined as "normal") and noted "atrophy of muscles: none." AR 393-94. He recommended, "She needs break from work." AR 394.

Plaintiff's muscle strength was not as reduced as one would expect if she spent 80% of her time in bed. Furthermore, the ALJ's paragraph on atrophy suggested that he was discussing lack of atrophy in Plaintiff's neck and back area; Plaintiff presents evidence only of right leg atrophy. Thus, this was a clear and convincing reason for discounting Plaintiff's testimony. Even if it were not,

_____

claimant's symptoms were not as severe as alleged); but see Gates v. Colvin, 621 F. App'x 457, 457-58 (9th Cir. 2015) (ALJ properly determined that claimant's "lack of muscle atrophy was incompatible with her claimed level of inactivity, and thus her 'subjective complaints and alleged limitations are out of proportion to the objective findings'").

however, any error would be harmless, because the ALJ gave other sufficient

reasons.

a. <u>Reason Four</u>: Use of Assistive Devices.

At the hearing, the ALJ questioned Plaintiff about her use of a cane.  She

testified that both Dr. Luthra and her PCP [primary care physician[9]] told her to use

it.  AR 47.  In his September 8, 2016 questionnaire, Dr. Luthra stated that Plaintiff

was "medically required" to use a cane for ambulation, although he qualified this as

Plaintiff's observation.  AR 505.

The ALJ also asked Plaintiff why she was wearing a C-collar neck brace.

AR 46.  Plaintiff explained that when she told Dr. Luthra that she "wasn't able to

stay up more than … an hour or two, upright," he prescribed it for her in 2013 or

2014.  AR 47.  In her Function Report, however, she stated that she had been

prescribed the neck brace back in 2008 and she wore it "at least 4 hrs during day if

… ambulatory or sitting."  AR 196.  In 2016, Dr. Luthra did not opine that Plaintiff

needed a neck brace to support her head while sitting or walking.  AR 505.

None of the records from Plaintiff's ER visits indicate that she was using a

cane or neck brace.  In January 2013, the ER staff described Plaintiff as "fully

ambulatory no limitations." AR 269.  In May 2014, ER staff noted that Plaintiff had

"normal mobility status" and was "able to climb up into very tall SUV without any

difficulty."  AR 442, 451.  Also in May 2014, Dr. Afra did not note that Plaintiff

used a cane to ambulate.  AR 355.

Regarding her collar neck brace, Plaintiff argues there is support for its

medical necessity because Dr. Herr "indicates that it is used daily."  (JS at 16, citing

AR 425.)  In that September 2015 record, Dr. Herr was merely reporting that

Plaintiff told him she "wears collar every day;" he was not expressing a medical

opinion.  AR 425.  In May 2014, Dr. Afra noted that she wore the neck brace to her

---

[9] The JS does not identify Plaintiff's PCP.  (JS at 12.)

19

examination and that she claimed she wore it 6-7 hours a day. AR 353. He opined that her foot orthotic was a necessary assistive device, but he did not provide such an opinion for the neck brace. AR 358.

Plaintiff had multiple cervical MRIs that revealed some mildly abnormal findings. See AR 513 (discussing 2007 and 2010 MRIs); AR 436-37 (2014 MRI: "essentially stable MRI cervical spine compared to the study of 7/3/12 … stable very mild cervical spondylosis and degenerative disc changes …"); AR 435 (2015 MRI: "Stable minimal changes of degenerative disc and facet disease with no spinal stenosis or neural foraminal narrowing. No acute abnormality identified."). Neither party cites a medical source opinion that Plaintiff's spinal condition requires her to wear a neck brace to support her head while sitting or walking. To the contrary, in 2015, Dr. Rosenblum observed Plaintiff was only "mildly limited" flexing, extending, and rotating her neck. AR 503.

In sum, Plaintiff's testimony that she must use a cane to ambulate is inconsistent with other medical evidence (AR 269, 355, 442, 451). Plaintiff's testimony that she needs to use a neck brace while upright is not supported by any medical evidence. The ALJ did not err in considering this when deciding what weight to give Plaintiff's testimony.

  a. Reason Five: Reason for Leaving Prior Employment.

Plaintiff testified that she last worked in 2013. AR 41. Her last employer put her on medical leave, but she "tried to go back when [she] was released to go back to work." AR 42. She was unable to go back because her "position was filled." Id. She testified that when she tried to go back to work, she would have been able to do her job physically, but then she "got worse about a month and a half later." Id.

During this same time, Plaintiff was seeing Dr. Herr and discussed with him her decision to stop working, as follows:

• December 2012: Plaintiff told Dr. Herr, "'I have a new boss' lot of pressure." AR 332.

1    • January 2013:  Plaintiff claimed that she "became unable to work because of

2    [her] disabling condition on January 24, 2013," and in 2014, she affirmed the truth

3    of this claim.  AR 163-64.

4    • February 2013: Dr. Herr reported, "Our discussion centers around her work

5    where she describes a situation that would require her to falsely take [paid] hours

6    away from employees."  AR 331.  Her treatment plan included, "investigate options

7    regarding her work" and "obtain counsel[l]ing for … future employment options."

8    <u>Id.</u>

9    • April 2013: Dr. Herr reported, "Problem is the concept of not telling the truth

10    at work which is the crux of her dilem[m]a continues to be so unsav[o]ry to her that

11    she has fallen into a depressive state."  AR 330.  She told him she was "not able to

12    return to work ć [with] same job she believes was forcing her to lie."  <u>Id.</u>

13    • August 2013: Dr. Herr reported, "Pt. continues to be very affected by her work

14    environment stating that her boss is still there & the thought of having to go back &

15    work under her in that situation is literally unbearable."  AR 329.

16    • February 2014:  Dr. Herr recorded Plaintiff's work history, noting that she

17    "resigned from work on July 23[, 2013]."  AR 327.  Plaintiff's condition became

18    "worse since Aug 28, 2013," and she saw Dr. Luthra on December 17, 2013.  <u>Id.</u>

19    She told Dr. Herr that she was "unable to be up only 2 hrs due to neck pain."  <u>Id.</u>

20    She "understands [Dr. Luthra] will place her on permanent disability."  AR 328.

21    Thus, substantial evidence supports the ALJ's finding that – contrary to her DIB

22    application – Plaintiff did not stop working on her alleged onset date or fail to

23    return to work after that date because of a disabling condition, but because of

24    conflict with her boss and dissatisfaction with her prior job.

25    While Plaintiff argues that the reason she stopped working is irrelevant (JS at

26    16), the Ninth Circuit has repeatedly found that stopping work for reasons other

27    than medical impairments and other than as claimed in a benefits application is a

28    valid factor in the ALJ's evaluation of Plaintiff's testimony.  <u>See, e.g.</u>, <u>Bruton v.</u>

Massanari, 268 F.3d 824, 828 (9th Cir. 2001) ("[T]he ALJ satisfied the [appropriate] standard by providing specific, cogent reasons for disregarding [claimant's] testimony," "[f]or example, the ALJ stated that she found [claimant's] subjective pain complaints not credible because, inter alia: (1) [claimant] stated at the administrative hearing and to at least one of his doctors that he left his job because he was laid off, rather than because he was injured."); see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) ("We will consider all of the evidence presented, including information about your prior work record . . .").

C. **ISSUES THREE AND FOUR: Dr. Luthra.**

**1. Rules for Weighing Conflicting Medical Evidence.**

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Turner v. Comm'r of SSA, 613 F.3d 1217, 1222 (9th Cir. 2010) (citation omitted). This rule, however, is not absolute. "Where . . . a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (emphasis added and citation omitted); see also Orn, 495 F.3d at 632 ("If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.") (citation omitted).

Here, the opinion of Dr. Luthra was contradicted by the opinions of State agency psychological consultants and a consultative examiner with respect to Plaintiff's alleged mental impairments, and was contradicted by State agency medical consultants and a consultative examiner with respect to Plaintiff's ability to perform light work. See AR 24, 28, 66-67, 69-72, 83-89, 346-47, 358-59. Thus,

22

under <u>Andrews</u> and <u>Orn</u>, the dispositive question is whether the ALJ gave "specific, legitimate reasons" for discounting Dr. Luthra's opinions.

### 2. Summary of Dr. Luthra's Opinions.

Plaintiff argues that the ALJ erred in failing to credit two medical source statements from Dr. Luthra: (1) the "Ability to Do Work-Related Activities (Physical)" form ("Physical Form" at AR 505-06) and (2) the "Ability to Do Work-Related Activities (Mental)" form ("Mental Form" at AR 507-09).

In the Physical Form, Dr. Luthra opined that Plaintiff could only stand/walk for one hour and sit for "0-2 hours" in an eight-hour workday. AR 505. She could "never" lift 10 pounds, "never" use her arms for pushing or pulling, "never" reach in any direction, and "never" finger. AR 505-06. He opined that every two hours, she would need to lie down for an hour and a half. AR 506. He opined that her speaking was impaired. <u>Id.</u> He opined that her pain medications caused drowsiness and dizziness. <u>Id.</u> Nearly all his opinions are qualified by a note in the margin that says "Pt's observat." AR 505-06. Based on comparison to a more clearly written note by Dr. Luthra that says "Pt's observation" (AR 507), these notes say "Pt's observations," but they were cut off at the margin by the copying process.

In the Mental Form, Dr. Luthra found Plaintiff had moderate limitations carrying out "short, simple instructions," marked limitations understanding and remembering detailed instructions, and extreme limitations with carrying out detailed instructions and "mak[ing] judgments on simple work-related decisions." AR 507. These are all qualified as "Pt's observations." <u>Id.</u> He opined that she had "marked" or "extreme" limitations in all areas of social functioning. <u>Id.</u> These opinions are also qualified by the statement, "Above is Patient's observat[ion]." AR 508 (last three letters cut off by margin).

### 3. The ALJ's Evaluation of Dr. Luthra's Opinions.

The ALJ gave the Mental Form "little weight" for the following reasons:
[I]t is inconsistent with records reflecting that the claimant's mood and

affect were normal [AR 271]. Furthermore, this opinion is inadequately supported by the evidence as a whole, and is inconsistent with the claimant's testimony that she is not receiving any mental health treatment.

AR 24.

While inconsistency with AR 271 (i.e., one record from the alleged onset date finding normal affect) might not provide a legitimate reason to discount Dr. Luther's opinions, the ALJ's other two reasons are legally sufficient and supported by substantial evidence. Dr. Luthra's opinions in the Mental Form are not merely "inadequately supported" by other evidence – they are wholly unsupported by other evidence, because Dr. Luthra expressly stated that he was merely recording Plaintiff's own observations. AR 507-08. The Mental Form is also inconsistent with Plaintiff's own failure to claim any form of mental impairment. See AR 50, 59, 193-96.

The ALJ gave the Physical Form "little weight" for the following reasons:

[I]t is inconsistent with the claimant's MRI examination of the cervical spine, which revealed mild cervical spondylosis and degenerative disk changes without significant central canal or neural foraminal stenosis, and her MRI examination of the lumbar spine, which showed mild findings [AR 433, 437]. Furthermore, this opinion is inconsistent with records reflecting . . . the claimant's [limitations on] range of motion of the neck, which [were] mild [AR 485 (Dr. Rosenblum's findings)].

AR 28-29. In other words, the ALJ found the Physical Form's extreme limitations inconsistent with medical evidence showing that Plaintiff's physical impairments are not so extreme. This was a specific, legitimate reason for discounting Dr. Luthra's opinions – to the extent the Physical Form even reflects Dr. Luthra's opinions rather than Plaintiff's own observations. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("The more a medical source presents relevant

evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").[10]

D. **ISSUE FIVE: Development of the Record.**

### 1. Rules Governing Development of the Record.

The claimant bears the burden of producing evidence to support a finding of disability. See 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). The Code of Federal Regulations further explains:

> [Y]ou have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled. This duty is ongoing and requires you to disclose any additional related evidence about which you become aware. This duty applies at each level of the administrative review process, including the Appeals Council level if the evidence relates to the period on or before the date of the administrative law judge hearing decision. We will consider only impairment(s) you say you have or about which we receive evidence.

20 C.F.R. §§ 404.1512(a), 416.912(a).

Nevertheless, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983) (holding duty not met where ALJ

---

[10] Plaintiff notes that Dr. Luthra was a specialist in neurology, and that the ALJ should have noted this and given Dr. Luthra's opinion great weight. (See JS at 25.) Dr. Luthra's specialty does not outweigh the other grave deficiencies in his opinion pointed out by the ALJ.

proceeded without a hearing).  This duty, however, is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); see also Agadzhanyan v. Astrue, 357 F. App'x 148, 150 (9th Cir. 2009) ("The ALJ's independent duty to develop the record was not triggered, because he did not find any piece of evidence to be ambiguous or difficult to interpret.").  When triggered, the ALJ "may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record."  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

## 2.  Summary of Claimed Error.

At the hearing, when counsel sought to question the VE using Dr. Luthra's assessment as a hypothetical, the ALJ asked, "Which one?  The physical or the mental?  Because I'm going to discredit the mental, and I may discredit the physical as well, at least at this time."  AR 55.  The ALJ stipulated that Dr. Luthra's physical assessment, if accepted, would preclude all work.  AR 55-56.  The ALJ noted that while he had not yet decided to discredit the physical assessment, he intended to look at the record again because he did not "think there's objective records here that are going to support what he's saying from the neurological side."  AR 56.  The ALJ added, "And I don't believe there's anything in the file is going to justify a cane, a brace, and/or the C-collar as well."  Id.  The ALJ offered to "keep the record open" for fifteen days to receive additional evidence from "Desert Spine and Neurosurgical" and Dr. "Lalonde," apparently a reference to Dr. Limonadi.[11]  Id.  The ALJ added, "after I get those, if I still don't find support, I'm going to send her

---

[11] At the time of the hearing, the medical evidence was comprised of exhibits 1-F through 15-F.  AR 38.  Records from the Desert Spine and Neurology Institute, including records from Dr. Limonadi, are exhibit 16-F.  AR 510-23.

1   out for interrogatories with a doctor Social Security will pick as a neurologist as to

2   any neurological finding that support any of this." AR 56-57. The ALJ concluded,

3   "So 15 days for [counsel] to respond with additional records, and then I'll look at it

4   and send it out as soon as – it's going to be at least two months to three months

5   before it will be concluded." AR 57.

6        The ALJ, however, did not send Plaintiff's file out for interrogatories.

7   Instead, on November 22, 2016 (i.e., about two months after the September 2016

8   hearing), he issued an adverse decision finding no medical support for either the

9   Physical Form or for Plaintiff's use of a cane and neck brace. AR 30.

10       Plaintiff argues that the ALJ's statements at the hearing were "essentially"

11  admitting that "the record was not sufficient to render an appropriate determination

12  concerning this claim," which triggered a legal duty to develop the record. (JS at

13  40.) Defendant counters that keeping the record open fifteen days after advising

14  Plaintiff's counsel of the perceived lack of support for Dr. Luthra's opinions and

15  Plaintiff's use of assistive devices was "all the ALJ was required to do." (JS at 41,

16  citing Tidwell, 161 F.3d at 602 (rejecting claimant's argument that the ALJ did not

17  develop the record before rejecting a doctor's check-the-box opinion, because the

18  ALJ notified claimant and counsel at the hearing about his concerns and explained

19  that he would keep the record open so that the doctor could supplement his

20  responses – "It is important to note that at this point the ALJ satisfied his duty

21  under [Circuit law]" to develop the record); Hanbey v. Astrue, 506 F. App'x 615,

22  616 (9th Cir. 2013) (unpublished) (even if the ALJ's duty to develop the record was

23  triggered, "the ALJ fulfilled that duty by according [claimant] the opportunity to

24  supplement the record after the hearing had concluded") (citation omitted).)

25  Defendant points out that if counsel needed more time to obtain or submit

26  additional evidence, then counsel could have requested an extension but did not do

27  so. (JS at 42.)

28       When the ALJ re-reviewed the medical evidence after the hearing, it would

have been reasonable to conclude that no additional information was necessary to evaluate Plaintiff's claims, because (as discussed above) the opinions in Dr. Luthra's Physical Form were extreme and qualified as "Pt's observations," Plaintiff's use of a neck brace was inconsistent with mild cervical MRI findings and no medical source had prescribed one, and multiple medical sources had observed Plaintiff ambulate without a cane. The ALJ had no duty to develop the record further.

E. **ISSUE SIX:  New Evidence.**

Plaintiff contends that remand is required to permit the ALJ to consider three new pieces of evidence.  See Dkt.19-1, 19-2, and 19-3.

**1.  Rules Governing New Evidence Presented to the Appeals Council.**

After the ALJ renders a decision denying benefits, the claimant may seek review by the Appeals Council.  20 C.F.R. §§ 404.970, 416.1470.  The Appeals Council will review the case under circumstances enumerated in the regulations, including where the ALJ's action, findings, or conclusions are not supported by substantial evidence.  Id. §§ 404.970(a)(3), 416.1470(a)(3).  If the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision, then the Appeals Council will review a case.  Id. §§ 404.970(a)(5), 416.1470(a)(5).

When the Appeals Council "declines review, 'the ALJ's decision becomes the final decision of the Commissioner,' and the district court reviews that decision for substantial evidence, based on the record as a whole."  Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1161-62 (9th Cir. 2012) (citation omitted).  The "record as a whole" includes any new evidence made part of the record by the Appeals Council, and "the district court must consider [that new evidence] when reviewing the Commissioner's final decision for substantial evidence."  Id. at 1163.

Here, the Appeals Council declined to make the new evidence part of the

record.  See AR 2.  Thus, Plaintiff's appeal falls under "sentence six" of 42 U.S.C. § 405(g), which provides for district court review of the Social Security Administration's final decision.[12]  It provides, in relevant part: "The Court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  Thus, remand here is appropriate only if (1) the new evidence is "material" and (2) there was "good cause" for the failure to incorporate such evidence into the record in prior administrative proceedings.

"To demonstrate good cause, the claimant must demonstrate that the new evidence was unavailable earlier."  Mayes, 276 F.3d at 463; see also Key v. Heckler, 754 F.2d 1545, 1551 (9th Cir. 1985) ("If new information surfaces after the Secretary's final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied.").

To be material, the new evidence must bear "directly and substantially on the matter in dispute."  Mayes, 276 F.3d at 462 (citation omitted).  This means that the new evidence is "probative of [the claimant's] condition as it existed at the relevant time—at or before the disability hearing."  Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 511 (9th Cir. 1988).  Materiality requires claimants to "demonstrate that there is a reasonable possibility that the new evidence would have changed the outcome of the administrative hearing."  Mayes, 276 F.3d at 463.

---

[12] Plaintiff cites Brewes, 682 F.3d at 1161-63, to argue that sentence six does not apply.  (See JS at 46.)  Brewes is distinguishable; there, the Ninth Circuit found that the Appeals Council *did* consider the new evidence in reaching its decision.

1      **2. Materiality.**

2          a. Dr. Vachhani.

3      Plaintiff's first new exhibit is a one-page form completed by Dr. Kishor

4  Vachhani on March 24, 2017, titled "Need for Assistive Hand-Held Device for

5  Ambulation." (Dkt. 19-1). Plaintiff does not explain her relationship with Dr.

6  Vachhani or how he came to complete this form. The parties do not cite any other

7  treating records from Dr. Vachhani.

8      This form was completed on March 24, 2017, long after the ALJ's decision

9  in November 2016. (Dkt. 19-1.) Nothing in the form indicates that Dr. Vachhani

10  was providing a retrospective opinion. Plaintiff argues that the form is nevertheless

11  "chronologically relevant" because Plaintiff's ambulatory difficulties in 2017 arose

12  from chronic impairments. (JS at 47-48.)

13      Plaintiff has failed to demonstrate that Dr. Vachhani's opinion relates to the

14  relevant period. Her degenerative disk disease – while chronic – is also

15  progressive. Progressive diseases generally cause increased functional limitations

16  over time. Plaintiff has claimed that her condition worsened significantly within

17  the space of one and a half months. AR 42. This, along with the fact that medical

18  sources observed her walk without a cane during the claimed period of disability

19  (AR 269, 353, 442, 451) and Dr. Luthra qualified his September 2016 opinion that

20  Plaintiff needs a cane to ambulate by noting that it was "Pt's observation," defeats

21  any inference that Dr. Vachhani's opinion relates back to the period before the

22  ALJ's decision.

23          b. Dr. Walayat

24      Plaintiff's second new exhibit is progress notes from psychiatrist Dr. Warris

25  Walayat from February, March, and April 2017. (Dkt. 19-2.) Plaintiff argues that

26  this new evidence is material because it shows "mental health treatment" which

27  rebuts one of the ALJ's findings. JS at 47; <u>see</u> AR 24 (citing "the claimant's

28  testimony that she is not receiving any mental health treatment").

The ALJ's finding was based on Plaintiff's clear testimony. AR 50. Plaintiff has consistently denied that she suffers from any disabling mental impairment. See AR 59, 193-96. The fact that she decided to seek mental health treatment *after* the ALJ's adverse decision citing lack of treatment has no tendency to show that she suffered from a severe mental impairment before the decision.

            c. New MRIs.

Plaintiff's third new exhibit reflects MRIs of Plaintiff's cervical and lumber spine taken on December 19, 2016, and January 26, 2017, respectively. (Dkt. 19-3.) Plaintiff argues that these new MRIs show "moderate to severe decreased disk height" which "refutes a major contention by the ALJ" that Plaintiff's MRIs generally revealed only mild abnormalities. (JS at 47.) The ALJ was interpreting earlier MRIs relevant to the period of claimed disability, including MRIs from 2007, 2010, 2012, 2014, and 2015. AR 435-36, 513. If the condition of Plaintiff's spine has worsened since November 22, 2016, then Plaintiff may file new applications, but such evidence provides no reason to remand the instant case.

## V.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.


DATED:  August 22, 2018


                                        _____
                                        KAREN E. SCOTT
                                        United States Magistrate Judge